# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| JOSEPH ALTHAUS,<br><br>Plaintiff,<br><br>v.<br><br>CENLAR AGENCY, INC.,<br><br>Defendant. | Civil No. 17-445 (JRT/DTS)<br><br>**MEMORANDUM OPINION AND ORDER ON MOTION TO DISMISS** |

Daniel M. Eaton, **CHRISTENSEN LAW OFFICE PLLC**, 800 Washington Avenue North, Suite 704, Minneapolis, MN 55401, for plaintiff.

Hilary L. Palazzolo and Michael J. Steinlage, **LARSON KING, LLP**, 30 East Seventh Street, Suite 2800, St. Paul, MN 55101, for defendant.

Plaintiff Joseph Althaus brings this action against Defendant Cenlar Agency, Inc., doing business as Cenlar FSB ("Cenlar"), alleging violations of the Real Estate Settlement and Procedures Act ("RESPA") and the Minnesota Residential Mortgage Originator and Servicer Licensing Act ("MOSLA"). Althaus also brings a claim for breach of contract and seeks declaratory relief. Cenlar moves to dismiss all claims against it under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Because the Court finds Althaus has pleaded a RESPA claim and Althaus's MOSLA claim is not preempted by federal law or regulation, the Court will deny Cenlar's motion with regard to those claims. The Court finds, however, that Althaus's breach of contract claim is duplicative and his declaratory relief claim is not one upon

which declaratory relief may be granted, and therefore, the Court will grant Cenlar's motion with regard to those claims.

**BACKGROUND**

Althaus refinanced his mortgage with Axia Capital, LLC on June 9, 2016, and "[s]hortly after," Cenlar, a federal savings bank, took over as the loan's servicer. (Am. Compl. ¶¶ 14, 20, Apr. 28, 2017, Docket No. 20.) Pursuant to the terms of the loan, Althaus was to deposit payments into an escrow account that Cenlar would use to make property tax, homeowners insurance, and mortgage insurance payments. (*Id.* ¶ 7; *id.*, Ex. 2 at 3.) The loan and escrow payments are governed by RESPA. (*Id.*, Ex. 2 at 3.) RESPA provides that a servicer "shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due," 12 U.S.C. § 2605(g), and Althaus's mortgage specifies that the "[l]ender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA," (Am. Compl. ¶ 17 (alteration in original)). Federal regulations interpreting RESPA provide that to comply with § 2605(g) a servicer must make payment "on or before the deadline to avoid a penalty." 12 C.F.R. § 1024.17(k)(1).

In October 2016, Cenlar failed to timely pay Althaus's property taxes out of his escrow account. (Am. Compl. ¶ 25.) Althaus became aware that his tax payment was delinquent on October 27, 2016, when he sought a home equity loan to pay a time-sensitive medical debt settlement. (*Id.* ¶¶ 25-27.) Althaus immediately called and

notified Cenlar of the problem. (*Id.* ¶ 27.) Cenlar represented that it would correct its error. (*Id.* ¶ 28.)

On November 2, 2016, Althaus paid the full amount owed, $3,173.64, including the $2,994.00 overdue payment and "penalties and fees totaling $179.64," to Carver County to ensure that he could obtain the equity line of credit to pay his medical debt settlement on time. (*Id.* ¶¶ 26, 29.) That same day, Althaus called Cenlar to seek reimbursement for the taxes that he paid. (*Id.* ¶ 32.) Cenlar contended that it had already paid Carver County, but Althaus contacted Carver County on November 9, 2016, and Carver County represented to him that it had not received any payment from Cenlar. (*Id*. ¶¶ 33-34.)

Althaus asserts that between November 9 and 30, 2016, he contacted Cenlar "repeatedly" to obtain a refund for his tax payments. (*Id*. ¶ 36.) Althaus alleges that on November 30, 2016, a Cenlar representative confirmed that Cenlar had received a refund from Carver County and stated that Cenlar would reimburse Althaus within 7-10 days. (*Id*. ¶ 37.) After not receiving reimbursement within that time period, Althaus again contacted Cenlar on December 13 and 19, 2016. (*Id*. ¶¶ 38-39.) On December 19, 2016, a Cenlar representative told Althaus that Cenlar would send him a check for $2,390.87; Althaus requested that the refund include the additional $782.77 that he paid Carver County. (*Id*. ¶ 39.) Althaus again called Cenlar on December 28, 2016, because he had still not received his refund. (*Id.* ¶ 40.) According to Althaus, the Cenlar representative told him that Cenlar sent a check for $2,390.87 but that Althaus's request for the additional $782.77 had been denied. (*Id*.) On December 31, 2016, Althaus received the

check for $2,390.87. (*Id*. ¶ 41.) Althaus alleges that on January 2, 2017, a Cenlar representative told him that he would not receive an additional refund because withdrawing that amount would result in a shortfall in his escrow account. (*Id*. ¶ 42.) But the Cenlar representative also allegedly told Althaus that his escrow account balance was $3,015.89. (*Id*. ¶ 43.)

Althaus filed his complaint on February 13, 2017, alleging that Cenlar violated RESPA by failing to properly reimburse him for the entire amount he paid to Carver County. (*Id*. ¶¶ 45, 49-64.) Althaus asserts that on March 8, 2017, Cenlar deposited $179.64 into Althaus's escrow account to refund the late fees Althaus paid. (*Id*. ¶ 46.)

Althaus alleges that Cenlar has a pattern or practice of making late property tax payments and failing to correct its errors in a timely manner. (*Id*. ¶¶ 47-48.) For support, Althaus cites posts from ConsumerAffairs.com where other customers complained about Cenlar failing to pay their property taxes. (*Id.* ¶ 47.) According to the complaint, Cenlar's failure to pay one poster's property taxes "result[ed] in a past due penalty from the County Assessor's Office," and, in another instance, the poster's "town [began] advertising [his or her] account as defaulting." (*Id.*) Specifically, one post stated that Cenlar purchased the poster's mortgage "3-4 months ago," but the poster was "already having trouble with [the] escrow money since [Cenlar] d[id] not want to release any funds for property taxes," and the poster "ended up having to pay real estate taxes from [his or her] own funds." (*Id.*)

On April 7, 2017, Cenlar moved to dismiss Althaus's claims for failure to state a claim upon which relief may be granted. On April 28, 2017, Althaus responded to

Cenlar's motion by filing an amended complaint, in part, to specify that Cenlar had failed to put Althaus's account in as good of position as it would have been otherwise because Cenlar failed to reimburse Althaus for the late fee until after Althaus commenced suit. (*Id.* ¶ 46.) On May 12, 2017, Cenlar responded to Althaus's amended complaint by filing its reply memorandum, arguing that Althaus's amended complaint fails for the same reasons as his initial complaint.[1]

## ANALYSIS

### I. STANDARD OF REVIEW

In reviewing a motion to dismiss brought under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a claim for "relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the Court

---

[1] Fed. R. Civ. P. 15(a) provides that a party may respond to an amended complaint within 14 days after they are served or within the time specified for response to the original complaint, whichever is longer. Where a party fails to respond to the allegations in the amended complaint the Court may moot its initial motion to dismiss. *Blount v. Carlson Hotels,* No. 11-452, 2011 WL 6098697, at *1 (W.D.N.C. Dec. 6, 2011) ("[A]n amended pleading supersedes the original pleading, and . . . motions directed at superseded pleadings are to be denied as moot." (citing *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001)). Here, the Court will construe Cenlar's reply to Althaus's opposition as a response to Althaus's amended complaint. 6 Charles Alan Wright et al., *Federal Practice and Procedure* § 1476 (3d ed. 2017) ("If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading. To hold otherwise would be to exalt form over substance." (footnote omitted)).

accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## II. RESPA CLAIMS

Althaus brings a claim under RESPA for Cenlar's failure to make timely tax payments from his escrow account. Althaus also brings a claim under RESPA for statutory damages, alleging that Cenlar has a pattern or practice of making delinquent tax payments.

### A. Safe Harbor Provision

Cenlar argues that the Court should dismiss Althaus's RESPA claim under the statute's safe harbor clause because Cenlar argues it corrected the error within sixty days of discovering it and before Althaus filed suit or provided written notice of the error. Under RESPA, a servicer that discovers an error may correct that error without incurring liability if it abides by the statute's safe harbor provision, which states:

> A transferor or transferee servicer shall not be liable under this subsection for any failure to comply with any requirement under this section if, within 60 days after discovering an error (whether pursuant to a final written examination report or the servicer's own procedures) and before the commencement of an action under this subsection and the receipt of written notice of the error from the borrower, the servicer notifies the person concerned of the error and makes whatever adjustments are necessary in the appropriate account to ensure that the person will not be required to pay an amount in excess of any amount that the person otherwise would have paid.

12 U.S.C. § 2605(f)(4). Cenlar argues that, because it attempted to pay Carver County on November 3, 2016, and subsequently reimbursed Althaus for his payment, the safe harbor provision applies.

First, Althaus responds that because he, rather than Cenlar, discovered the error, the safe harbor provision does not apply. Althaus contends that, because the statute shields servicers who correct an error "within 60 days after **discovering** [the] error," the statute only applies when the servicer discovers the error first, on its own. *Id.* (emphasis added). Althaus further argues that the safe harbor provision requires that "the servicer **notif[y]** the person concerned of the error," and the servicer cannot satisfy this requirement when the borrower already knows of the error and notified the servicer. *Id.* (emphasis added); *see also Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 685 (7th Cir. 2011) (denying protection of the safe harbor when the servicer failed to notify the borrower of the error before the borrower commenced suit).

While the statute does not define the precise type of notice required to satisfy the safe harbor provision, the Court finds that Cenlar provided Althaus with sufficient notice of the error to satisfy the provision. Althaus does not dispute that Cenlar discussed the error with him and confirmed that it made an error, which is sufficient notice of the error under RESPA. Further, under Althaus's reading of the statute – if a borrower could prevent the servicer from ever "notifying" him or her by providing oral notice to the servicer – the safe harbor's requirement that the servicer correct the error before the borrower commences suit or provides **written** notice to the servicer would be unnecessary because any notice from the borrower would be sufficient to prevent safe

harbor protection. *See* 12 U.S.C. § 2605(f)(4) (providing safe harbor when the servicer remedies an error "before the commencement of an action under this subsection and the receipt of written notice of the error from the borrower"). Thus, the Court rejects Althaus's argument that Cenlar does not fall within the safe harbor provision based on Althaus's oral notice to Cenlar.[2]

Second, Althaus contends that Cenlar should not be able to invoke the safe harbor provision because it did not, within sixty days of discovering the error, "make[] whatever adjustments are necessary in the appropriate account to ensure that the person will not be required to pay an amount in excess of any amount that the person otherwise would have paid." *Id.* Althaus alleges that, prior to filing his complaint, he received only $2,390.87 from Cenlar, although he paid Carver County $3,173.64. Althaus further alleges that he received the $2,390.87 payment on December 31, 2016, which was more than sixty days after he notified Cenlar of the error on October 27, 2016. Thus, taking Althaus's allegations as true, Cenlar has failed to put Althaus's account in as good of a position as it would have otherwise been within the sixty days allotted by the safe harbor provision.

---

[2] Althaus also argues that the statute's parenthetical describing manners for discovering the error – "(whether pursuant to a final written examination report or the servicer's own procedures)" – exhaustively lists the methods by which a servicer may discover an error, while remaining within the protection of the safe harbor. 12 U.S.C. § 2605(f)(4). But "a parenthetical . . . cannot be used to overcome the operative terms of the statute." *Chickasaw Nation v. United States*, 534 U.S. 84, 94-95 (2001) (quoting *Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 990 (4th Cir. 1996))). Here, the Court finds it improper to read additional limitations into the safe harbor provision based on the parenthetical, which the Court finds includes a non-exhaustive list of the means by which a servicer may discover its error within the protection of the safe harbor. *See Ballanger v. Johanns*, 495 F.3d 866, 871-72 (8th Cir. 2007) (finding a statutory parenthetical was a non-exhaustive list that did not necessarily set forth additional requirements). Accordingly, Cenlar need not show that it discovered the error through a written examination report or its own procedures to satisfy the safe harbor.

Accordingly, the Court will deny Cenlar's motion with respect to Althaus's RESPA claim.

### B. Pattern or Practice of Noncompliance

Cenlar next asks the Court to dismiss Althaus's request for statutory damages under RESPA. RESPA provides for "additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." 12 U.S.C. § 2605(f)(1)(B). Althaus alleges that Cenlar engaged in a pattern or practice of failing to make timely property tax payments. In support, Althaus cites several website posts, which suggest Cenlar has failed to make timely tax payments and further failed to timely correct its error on at least six occasions.

Cenlar argues that Althaus's allegations are insufficient to adequately plead a pattern or practice under RESPA. A plaintiff may establish a pattern or practice of noncompliance by showing that the servicer has repeated the same violation against different borrowers. *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1247-48 (11th Cir. 2016). Some courts have dismissed requests for statutory damages under RESPA where a plaintiff failed to allege a pattern of practice of **wrongful** conduct. *See Miranda v. Ocwen Loan Servicing, LLC,* 148 F. Supp. 3d 1349, 1355-56 (S.D. Fla. 2015) (finding the plaintiff's allegations "that the defendant refused to supply some requested information to unidentified nonparties, without identifying any wrongfully withheld information" was insufficient for statutory damages under RESPA); *Rodriguez v. Seterus Inc.*, No. 15-61253, 2015 WL 5677182, at *3 (S.D. Fla. Sept. 28, 2015) (finding the

plaintiff's allegations regarding "numerous correspondences" without any identification of particular provisions of RESPA the servicer had allegedly violated or the identities of the affected borrowers were too conclusory and too vague to survive a motion to dismiss). But "[d]isclosing the identities of other borrowers, the dates of the letters, and the specifics of their inquiries is not a prerequisite to pleading statutory damages." *Renfroe*, 822 F.3d at 1247-48.

Here, Althaus alleged that Cenlar failed to make timely tax payments on several occasions and failed to correct its errors within the safe harbor provision's time frame. For example, Althaus's allegations include a website post stating "[m]y mortgage was bought by Cenlar only 3-4 months ago. I am already having trouble with my escrow money since they do not want to release any funds for property taxes . . . I ended up having to pay real estate taxes from my own funds." (Am. Compl. ¶ 47-48 (alteration in original).) Taking Althaus's allegations as true, they allege facts sufficient to plausibly suggest at the pleading stage a pattern or practice of violating the same provision of RESPA alleged by Althaus. 12 U.S.C. § 2605(g).

### III.  MOSLA CLAIM

Althaus also brings a claim under MOSLA seeking additional damages resulting from Cenlar's failure to fulfill its obligations as a mortgage servicer. *See* Minn. Stat. § 58.13, subd. 1(a), (b)(8) ("No person acting as a residential mortgage originator or servicer . . . shall . . . violate any provision of any other applicable state or federal law regulating residential mortgage loans including, without limitation, sections 47.20

[(mortgage-backed securities)] to 47.208 [(delivery of satisfaction of mortgage)] and 47.58 [(reverse-mortgage loans)].").

Cenlar argues that Althaus's MOSLA claim is expressly preempted by federal law and regulations.[3] Cenlar relies on a regulation promulgated by the Office of the Comptroller of the Currency ("OCC") pursuant to its power under the National Bank Act ("NBA"). 12 C.F.R. § 34.4. The OCC regulation, entitled "Applicability of state law," states: "A national bank may make real estate loans under 12 U.S.C. [§] 371 and [12 C.F.R.] § 34.3, without regard to state law limitations concerning: . . . (6) escrow accounts . . . ; (10) processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages." *Id.* § 34.4(a)(6), (10).

Cenlar contends that § 34.4(a)(6) and (10) expressly preempt state laws having to do with escrow accounts and servicing, including the MOSLA provision at issue here. The regulations' plain language, however, states only that "[a] national bank may **make** real estate loans" notwithstanding certain state law limitations. *Id.* § 34.4(a) (emphasis added). In contrast, the referenced statute and regulation provide authority for additional national bank actions, stating that a national bank may "**make, arrange, purchase or sell**

---

[3] Cenlar initially argued that MOSLA was preempted by the Home Owners' Loan Act ("HOLA") and regulations promulgated pursuant to HOLA, namely 12 C.F.R. § 560.2. *See Bazil v. Wells Fargo Bank, N.A.*, No. 11-1206, 2011 WL 4442835, at *4 (D. Minn. Sept. 22, 2011) ("[A]s the Eighth Circuit has recognized, the [Office of Thrift Supervision] intends to 'occupy the entire field of lending regulation' for federal savings banks . . . ." (quoting *Casey v. FDIC*, 583 F.3d 586, 593 (8th Cir. 2009))). This argument, however, relies on the theory of field preemption, which was rejected by Congress in the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. *See Quintero v. Wells Fargo Bank, N.A.*, No. 13-4937, 2014 WL 202755, at *3 (N.D. Cal. Jan. 17, 2014). Cenlar likely recognized this fact because its reply memorandum argues instead for express preemption under the National Bank Act ("NBA") and regulations implemented pursuant to the NBA, which will be discussed above.

loans" subject to OCC regulation. 12 U.S.C. § 371(a) (emphasis added); 12 C.F.R. § 34.3. Thus, § 34.4(a)'s express preemption appears to apply only to national banks "mak[ing]" loans. If the OCC intended to expressly preempt state laws with regard to other national bank activities, it could have used broader language as in § 34.3 ("make, arrange, purchase or sell") or § 34.4(b) (mentioning "the real estate lending powers of national banks"). The cases Cenlar cites do not counsel against such result, as they all involved loan originators. *See Bohnhoff v. Wells Fargo Bank, N.A.*, 853 F. Supp. 2d 849, 858 (D. Minn. 2012).[4] Accordingly, the Court finds that § 34.4(a) does not expressly preempt MOSLA with regard to Cenlar, a national bank servicing a loan originated by a non-national bank.

Even though the MOSLA provision is not expressly preempted by OCC regulation, it could still be preempted under the Supreme Court's *Barnett Bank* "significant interference" analysis. 12 U.S.C. § 25b(b)(1)(B); *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996) (holding that a state law that "does not prevent or significantly interfere with the national bank's exercise of its powers" is not preempted). Althaus argues that because MOSLA only complements the federal regulation by adding additional damages without imposing additional requirements, it is not implicitly preempted. The Court agrees that because MOSLA does not significantly

---

[4] *See also Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 556-57 (9th Cir. 2010) (dismissing state law claim against originator based on excessive underwriting fees, finding the claim preempted under 12 C.F.R. § 34.4(a)(10)); *Acosta v. Wells Fargo Bank, N.A.*, No. 10-991, 2010 WL 2077209, at *8 (N.D. Cal. May 21, 2010) (finding claim against loan originator based on a state law regulating foreclosures was preempted due to 12 C.F.R. § 34.4(a)(10)).

interfere with Cenlar's exercise of its powers, it is not implicitly preempted under *Barnett Bank*. Thus, MOSLA is neither expressly nor implicitly preempted as applied to Cenlar in this case. Accordingly, the Court will deny Cenlar's motion with respect to Althaus's MOSLA claim.

## IV. BREACH OF CONTRACT

Althaus also brings a breach of contract claim against Cenlar for its failure to pay his property taxes on time. Althaus argues that he may bring this claim as an alternative to his RESPA claim. While plaintiffs may assert alternative claims to relief, *see* Fed. R. Civ. P. 8(d)(2)-(3), Althaus's breach of contract claim is entirely dependent on his RESPA claim, and thus it is not a true alternative claim. Courts have inherent authority to dismiss duplicative claims. *R.S. ex rel. S.S. v. Minnewaska Area Sch. Dist. No. 2149*, 894 F. Supp. 2d 1128, 1148 (D. Minn. 2012). Here, Althaus concedes that his breach of contract claim is part of his RESPA claim. Because his breach of contract claim is not independently viable without his RESPA claim, it is duplicative of and does not add anything to this case.[5] Accordingly the Court will grant Cenlar's motion with respect to Althaus's breach of contract claim.

---

[5] Althaus also argues that, because he alleges that Cenlar violated Minn. Stat. § 58.13, subd. 1(a)(5) by "failing to perform in conformance with its written agreements with borrowers," he must be allowed to proceed on his breach of contract claim. But even as a part of Althaus's MOSLA claim, the only breach alleged is failure to comply with RESPA, and thus this claim also rises and falls with Althaus's RESPA claim. Additionally, violating a federal statute is an independent ground supporting a MOSLA claim, and therefore, the breach of contract claim does not add anything to Althaus's MOSLA claim. *See* Minn. Stat. § 58.13, subd. 1(a)(8) (allowing recovery under MOSLA for "violat[ing] any provision of any other applicable state or federal law regulating residential mortgage loans").

## V. DECLARATORY RELIEF

Finally, Althaus brings a claim for declaratory relief, asking the Court to order Cenlar to make appropriate corrections to his account and to refund Althaus's funds to correct the errors. This claim is improperly brought as declaratory relief. The Federal Declaratory Judgment Act and Minnesota Declaratory Judgment Act vest courts with the power to declare rights and legal relations of interested parties. 28 U.S.C. § 2201; Minn. Stat. § 555.01. Courts generally deny claims for declaratory relief where the relief sought may be obtained under other causes of action. *See e.g. Mangindin v. Wash. Mut. Bank*, 637 F. Supp. 2d 700, 707 (N.D. Cal. 2009) ("A claim for declaratory relief is unnecessary where an adequate remedy exists under some other cause of action.").

Here, Althaus does not request that the Court declare the legal rights and relations of interested parties. Althaus instead asks the Court to order one party to carry out an action, which exceeds the scope of a declaration available under the declaratory judgment statutes. Further, Althaus may obtain the remedy he seeks through his other causes of action. Thus, Althaus's request for declaratory relief is not a claim upon which relief can be granted, and the Court will grant Cenlar's motion with respect to Althaus's claim for declaratory relief.

**ORDER**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Cenlar's Motion to Dismiss [Docket No. 12] is **GRANTED in part and DENIED in part** as follows:

    1.    The motion is **GRANTED** with regard to Althaus's breach of contract and declaratory relief claims. Althaus's breach of contract and declaratory relief claims are **DISMISSED without prejudice**.

    2.    The motion is **DENIED** in all other respects.

DATED: October 10, 2017　　　　　　　　_____s/John R. Tunheim_____
at Minneapolis, Minnesota.　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　　　Chief Judge
　　　　　　　　　　　　　　　　　　　United States District Court